**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THE COMMONWEALTH OF MASSACHUSETTS, | CIVIL NO.: _____ |
| *Plaintiff,* | **DEFENDANT CAREMARKPCS HEALTH, L.L.C.'S NOTICE OF REMOVAL** |
| v. | |
| ELI LILLY AND COMPANY, et al., | |
| *Defendants.* | |

**DEFENDANT CAREMARKPCS HEALTH, L.L.C.'S**
**NOTICE OF REMOVAL**

Pursuant to and in accordance with 28 U.S.C. §§ 1442(a) and 1446, through the undersigned counsel, CaremarkPCS Health, L.L.C. ("Caremark") hereby removes *The Commonwealth of Massachusetts v. Eli Lilly and Company, et al.*, (Case No: 2584CV0086), from the Suffolk County Superior Court to this United States District Court for the District of Massachusetts. A true and correct copy of the Complaint is Exhibit A.

## INTRODUCTION

1.  The Complaint takes aim at well-known, industry-standard arrangements between manufacturers of pharmaceutical drugs, pharmacy benefit managers ("PBMs"), and health plan sponsors.

2.  PBMs perform a range of services for their health-plan-sponsor clients, from negotiating the price of drugs to administering claims. In this action, the Commonwealth asserts that the rebates PBMs negotiate with manufacturers are not legitimate terms negotiated at arm's

length, but "secret," "undisclosed" payments made to benefit PBMs and manufacturers that distort the market and drive up drug prices. Compl. ¶¶ 24, 30, 445, 451. Based on those allegations, the Commonwealth asks the Court both to impose a monetary award and to stop PBMs from negotiating rebates with manufacturers to obtain rebates for their clients. *Id.* at pp.144–45.

3. The Commonwealth's sweeping allegations challenge conduct that Caremark—a PBM—carries out under a federal officer. Caremark, like other PBMs, negotiates with drug manufacturers to obtain rebates for its clients. Some of those clients are private health plans; others are governed by the Federal Employees Health Benefits Act ("FEHBA"), a federal statute. Federal regulators explicitly authorize PBMs to negotiate rebates for these "FEHBA carriers" and contractually require PBMs to pass all rebates they receive onto their FEHBA carrier clients.

4. Caremark conducts rebate negotiations simultaneously to enter into Rebate Agreements applicable to various clients, including FEHBA plans. But none of the rebates that Caremark negotiates for insulin are exclusive to FEHBA plans; rather, all insulin rebate negotiations that involve FEHBA plans involve non-FEHBA plans as well. The Commonwealth's challenge to Caremark's conduct in rebate negotiations, therefore, is necessarily a challenge to conduct under a federal officer. That challenge is expressly preempted by FEHBA itself. *See* 5 U.S.C. § 8902(m)(1). Caremark is entitled, under the federal officer removal statute, to litigate that defense in federal court. *See* 28 U.S.C. § 1442(a)(1).

## BACKGROUND

5. The Commonwealth alleges a sprawling, industrywide pricing scheme involving drug manufacturers like Eli Lilly, Novo Nordisk, and Sanofi (collectively, the "Manufacturers") and three of the nation's largest pharmacy benefit managers, Caremark, Express Scripts, Inc., and OptumRx, Inc. (collectively, the "PBM Defendants" or "PBMs"). Compl. ¶¶ 78–85. Numerous

other plaintiffs have brought similar claims against Defendants arising out of this alleged "Insulin Pricing Scheme," most of which have been consolidated in the *In re Insulin Pricing Litigation* MDL, No. 3080, pending in the District of New Jersey. Upon removal, Defendants will notice this case as a potential tag-along action to the Judicial Panel on Multidistrict Litigation, with the intent to have this case similarly consolidated for pretrial proceedings.

6. PBMs contract with health plan sponsors, such as public and private employers, to administer prescription drug benefits. Among other things, PBMs develop lists of drugs called "formularies," which health-plan clients can adopt to determine whether and to what extent those clients cover the cost of certain medications for their members. Compl. ¶¶ 9–10. Although PBMs develop formulary products they offer to clients, their clients decide whether to accept, reject, or customize an offered formulary and set the coverage that applies to their members. *See id*. ¶¶ 9, 13, 125, 181.

7. PBMs play an important role managing the out-of-pocket cost of pharmaceutical drugs for their health-plan clients. PBMs negotiate with pharmaceutical manufacturers to obtain rebates that help offset the cost of pharmaceutical drugs. *See, e.g.*, *id.* ¶ 86. Those rebates flow back to the PBMs' clients under their client-negotiated contracts, lowering the clients' net drug costs and helping payors manage expenses. *Id.* ¶¶ 86–87.

8. Rebate negotiations are a key component of the provision of pharmacy benefit services. Although some health plans, such as those operated by certain states, directly negotiate with manufacturers, most health plans hire PBMs to engage in such negotiations.

9. Accordingly, federal regulators expressly contemplate that PBMs will engage in such negotiations to obtain rebates for their clients, including clients that provide benefits to federal employees who receive insurance under FEHBA. FEHBA "establishes a comprehensive program

of health insurance for federal employees." *Coventry Health Care, Inc. v. Nevils*, 581 U.S. 87, 91 (2017) (citation omitted). FEHBA "assigns to [the United States Office of Personnel Management ("OPM")] broad administrative and rulemaking authority over the program," *id.* (citing 5 U.S.C. §§ 8901–8913), and authorizes OPM to contract with private carriers for federal employees' health insurance, 5 U.S.C. § 8902(a).

10.     OPM requires that participating health insurance plans include prescription drug coverage, but permits FEHBA carriers to contract with PBMs and delegate certain responsibilities to them. OPM expressly contemplates that contracts between PBMs and FEHBA carriers will include "Manufacturer Payments," which it defines broadly to mean "any and all compensation, financial benefits, or remuneration the PBM receives from a pharmaceutical manufacturer, including but not limited to, discounts; credits; rebates, regardless of how categorized; market share incentives, chargebacks, commissions, and administrative or management fees" as well as "any fees received for sales of utilization data to a pharmaceutical manufacturer." Off. of Personnel Mgmt., *Federal Employees Health Benefits Program Standard Contract for Experience-Rated Health Maintenance Organization Carriers*, at I-18 (2019) ("FEHB Standard Experience-Rated HMO Contract"), *available at* https://tinyurl.com/yz2r4jef (last visited February 12, 2025) (attached as Exhibit B). With respect to these payments, OPM imposes various requirements on FEHBA carriers and PBMs:

  a.     OPM contractually requires FEHBA carriers to include in contracts with PBMs provisions that require the PBM to provide quarterly and annual reports regarding "Manufacturer Payments" that are negotiated or collected from drug manufacturers, including payments "in return for formulary

placement and/or access." FEHB Standard Experience-Rated HMO Contract at I-19.

b. OPM contractually requires FEHBA carriers to include in contracts with PBMs provisions that specifically control how PBMs must incorporate rebates into reported pricing: "The PBM agrees to provide pass-through transparent pricing based on the PBM's cost for drugs (as described below) in which the Carrier receives the value of the PBM's negotiated discounts, rebates, credits or other financial benefits." *Id.* at I-18.

c. OPM contractually requires FEHBA carriers to include in contracts with PBMs a provision by which "[t]he PBM, or any other entity that negotiates and collects Manufacturer Payments allocable to the Carrier agrees to credit to the Carrier either as a price reduction or by cash refund the value [of] all Manufacturer Payments properly allocated to the Carrier." *Id.* at I-18.

11. Pursuant to OPM's directives, the contracts between Caremark and its FEHBA clients mandate pass-through transparent pricing. These provisions ensure that FEHBA clients receive the value of Caremark's negotiated rebates and other manufacturer payments. Subject to these requirements, rebate amounts negotiated by PBMs and credited to the FEHBA carrier reduce the amounts paid for medicine by the federal government in connection with FEHBA benefits.

12. FEHBA carriers must also agree to contractual provisions that enable OPM to exercise direct oversight of certain PBM activities, including with respect to Manufacturer Payments:

a. OPM contractually requires FEHBA carriers to include in contracts with PBMs provisions that specifically require PBMs to provide to OPM upon

request "[a]ll PBM contracts with Pharmaceutical Manufacturers." FEHB Standard Experience-Rated HMO Contract at I-19.

b. OPM is contractually entitled to "review and receive any information and/or documents the Carrier receives from the PBM, including a copy of its contract with the PBM." FEHB Standard Experience-Rated HMO Contract at I-19.

13. Caremark has contracts with FEHBA carriers pursuant to which Caremark provides delegated PBM services, including with regard to formularies and Manufacturer Payments. Under these contracts, Caremark may also be subject to audits by the OPM Inspector General Office of Audits ("OIG"). OIG has exercised its authority to audit Caremark's performance of PBM services on behalf of FEHBA clients, including auditing Caremark's practices regarding Manufacturer Payments.

14. Rebate agreements between PBMs and Manufacturers ("Rebate Agreements") are structured to cover a range of different clients and different formulary possibilities, including standard and custom formularies. Caremark does not negotiate separate Rebate Agreements for each of its clients. Instead, to maximize its leverage, Caremark negotiates for multiple clients at the same time. As a result, for most of the period referenced in the Complaint, the same Manufacturer-PBM Rebate Agreements that governed rebates paid by Manufacturers in connection with FEHBA plans also governed rebates paid in connection with non-FEHBA plans.

15. Caremark's FEHBA clients generally expect that Caremark can and will obtain competitive rebates to offset the costs of pharmaceutical drugs. These rebates are intended to ultimately reduce the cost of federal employee healthcare incurred by the government and/or

employees. Such FEHBA clients would not contract with a PBM that was unable or unwilling to obtain discounts in the form of Manufacturer Payments, like rebates.

16.     The rebates that Caremark passes through to FEHBA clients ultimately reduce the cost of federal employee healthcare incurred by the government and/or employees.

## THE COMMONWEALTH'S ALLEGATIONS

17.     The Commonwealth's allegations challenge and seek to enjoin core business practices by which Caremark and other PBMs reduce drug costs for their clients. The Complaint alleges that the PBMs' negotiations with Manufacturers are not hard-fought, arm's-length transactions, but a conspiracy to raise the price of prescription drugs. It also alleges that the PBMs encouraged Manufacturers to inflate the list prices of their prescription drugs, and that rebate payments are covertly made in exchange for inclusion on formularies. *E.g.*, Compl. ¶ 24.

18.     Thus, the Complaint alleges an "unfair and deceptive scheme" in which Manufacturers raise the price of prescription drugs to increase the size of the rebates flowing back to the PBMs in exchange for preferred formulary placement. *Id.* ¶¶ 12–18. The Commonwealth alleges that the PBMs make "misleading and deceptive" representations "that they use their market power to drive down prices for diabetes medications," and that PBMs instead "work[] together to drive up drug prices for Massachusetts diabetics." *Id.* ¶¶ 34–35. The Commonwealth further alleges that the PBMs' negotiations are "directly responsible" for "the artificially inflated list prices" of drugs. *Id.* ¶ 381.

19.     The Commonwealth's claims in this case broadly challenge core services that Caremark offers to provide to all of its clients and for all pharmaceutical products, including those governed by FEHBA contracts. The Commonwealth alleges that PBMs "do not want the prices for diabetes medications to go down because they make more money on higher prices" and that "Manufacturer Defendants recognize that because PBM Defendants have such a dominant market

share, if they chose to exclude a particular diabetes medication from their standard formularies …
it could mean billions of dollars in profit loss." *Id.* ¶¶ 363, 366. Thus, the Commonwealth alleges
that "Defendants have found a way to game the system for their mutual benefit." *Id*. ¶ 365. The
relief the Commonwealth seeks—including injunctive relief, restitution, civil penalties, and "all
available relief," *id.* ¶ 47—would impair (if not eliminate) Caremark's ability to deliver those
services to clients, including FEHBA carriers.

20.     As detailed below, Caremark raises colorable federal defenses to the
Commonwealth's claims, permitting removal under 28 U.S.C. § 1442(a)(1).

## PROCEDURAL HISTORY

21.     On January 13, 2025, the Commonwealth filed its Complaint in the Suffolk
County Superior Court. *See* Exhibit A.

22.     On January 15, 2025, Caremark agreed to waive service of the Complaint.

23.     On January 16, 2025, the Chief Justice ordered the case transferred to the Business
Litigation Section of the Suffolk County Superior Court.

24.     The Commonwealth brings this action against two categories of defendants: the
"Manufacturer Defendants" and the "PBM Defendants." Compl. ¶¶ 5–6; 120, 171, 217.[1]

- •     The Commonwealth alleges that the "Manufacturer Defendants" are Eli
  Lilly and Company; Sanofi-Aventis U.S. LLC.; and Novo Nordisk Inc.

- •     The Commonwealth alleges that the "PBM Defendants" are CVS Health
  Corporation; CVS Pharmacy, Inc.; Caremark Rx, LLC; CaremarkPCS Health, LLC;
  Caremark, LLC; Zinc Health Ventures, LLC; Zinc Health Services; LLC; UnitedHealth
  Group, Inc.; OptumRx, Inc.; Emisar Pharma Services LLC; OptumInsight, Inc.; Evernorth
  Health, Inc.; Express Scripts, Inc.; Express Scripts Administrators, LLC; ESI Mail
  Pharmacy Service, Inc.; Ascent Health Services LLC; and Medco Health Solutions, Inc.

---

[1] Many of the entities the Commonwealth includes in its definition of "PBM Defendants" are not
PBMs and do not provide PBM services.

## VENUE

25.     Venue is proper in this Court under 28 U.S.C. § 1442(a) because this Court sits in the federal judicial district embracing the Suffolk County Superior Court, the court from which removal is sought.  *See* 28 U.S.C. § 1446(a); 28 U.S.C. § 101.

## STANDARD OF REVIEW

26.     A notice of removal must contain only "a short and plain statement of the grounds for removal."  *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 87 (2014) (quoting 28 U.S.C. § 1446(a)); *see also id.* ("By design, § 1446(a) tracks the general pleading requirement stated in Rule 8(a) of the Federal Rules of Civil Procedure.").

## GROUNDS FOR REMOVAL

27.     The federal-officer-removal statute permits any person "acting under" a federal officer who is sued "for or relating to any act under such color office" to remove a case to federal court.  28 U.S.C. § 1442(a)(1).

28.     The Supreme Court has "rejected a 'narrow, grudging interpretation' of the [federal-officer-removal] statute." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999) (quoting *Willingham v. Morgan*, 395 U.S. 402, 407 (1969)); *see also Moore v. Elec. Boat Corp.*, 25 F.4th 30, 35 (1st Cir. 2022) (citation omitted) ("In 2011, Congress amended § 1442(a)(1) to reach removal based on a suit 'for or relating to any act under color of [federal] office.'" (alteration in original)).

29.     To remove under section 1442 in the First Circuit, a party who, like CaremarkPCS Health L.L.C., is not an actual federal officer or agency must show (1) that they "act[ed] under a federal officer's authority," (2) that the alleged actions were "carried out 'for or relating to' the asserted federal authority," and (3) that the defendant has a "colorable federal defense" to the plaintiffs' claims. *See Moore*, 25 F.4th at 34.  Caremark easily satisfies all three elements.

9

### A. Caremark Acted Under the Direction of a Federal Agency.

30.     "The words 'acting under' are broad," and the Supreme Court "has made clear that the statute must be 'liberally construed.'" *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007).  In the context of section 1442(a)(1), the Supreme Court has interpreted "acting under" a federal officer to contemplate a relationship where the private party engages in an effort "to assist, or to help carry out, the duties or tasks of the federal superior." *Moore*, 25 F.4th at 34 n.3 (quoting Watson, 551 U.S. at 151–52).  "For example, a private contractor that helps the Government to produce an item it needs and thus helps officers fulfill other basic governmental tasks" satisfies this element because "it assists with a governmental function that the government itself would have had to perform." *Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 182 (1st Cir. 2024) (cleaned up).

31.     FEHBA "establishes a comprehensive program of health insurance for federal employees." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 682 (2006).  "OPM has direct and extensive control over [FEHBA-carrier] benefits contracts under the FEHBA." *Puerto Rico*, 119 F.4th at 182; *see St. Charles Surgical Hosp., L.L.C. v. La. Health Serv. & Indem. Co.*, 935 F.3d 352, 356 (5th Cir. 2019) ("Under the FEHBA, OPM is responsible for contracting with private insurance carriers [FEHBA carriers] to provide health benefits plans to federal employees.").  As discussed above, Caremark administers health benefits for federal employees pursuant to contracts with FEHBA carriers.  OPM oversees that administration, determining everything from how Caremark must define, report, and identify Manufacturer Payments; to how it must incorporate rebates into reported pricing; to the percentage of rebates it must pass on to federal clients (requiring 100% pass through); to the information it must provide to OPM upon request. *Supra* ¶¶ 9–12.  In carrying out its duties pursuant to FEHBA carrier contracts, Caremark

therefore is "subject to OPM oversight . . . , submits to OPM's regulatory requirements, and ultimately answers to federal officers." *St. Charles*, 935 F.3d at 356.

32.     This Circuit recently ruled on this very issue, concluding—in a nearly identical lawsuit brought by the Commonwealth of Puerto Rico and alleging the same "Insulin Pricing Scheme" alleged here—that Caremark acts under OPM when performing rebate negotiations because "OPM dictates several contractual provisions that Caremark must adhere to in entering those rebate agreements," which obligations "demonstrate that OPM exercised detailed supervision and monitoring over Caremark's provision of PBM services to FEHBA carriers, such that Caremark was acting under federal authority when it negotiated rebates." *Puerto Rico*, 119 F.4th at 190. The court explained that "Caremark alleges that when it negotiates rebates as OPM's contractual provisions demand, it assists the federal government with a task that the government would otherwise have to perform itself: administering federal health benefits for federal employees through FEHBA." *Id.* at 191 (citation omitted).

33.     The United States District Court for the District of Hawai'i reached the same conclusion in a case brought by the State of Hawai'i, explaining that "Caremark's actions at issue in [that] case regarding its formulary and rebate practices were 'actions under a federal officer,' i.e. OPM." *Hawai'i ex rel. Lopez v. CaremarkPCS Health, LLC*, 2024 WL 1907396, at *9 (D. Haw. May 1, 2024) (quoting *Goncalves ex rel. Goncalves v. Rady Child.'s Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017)).

34.     Other courts' rulings are in accord. The Fifth, Eighth, Ninth, and Eleventh Circuits have held that FEHBA carriers meet the requirements of section 1442 in their capacity as "administrator[s] of health care benefits for federal employees." *St. Charles*, 935 F.3d at 354; *Goncalves*, 865 F.3d at 1247; *Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1233-34 (8th Cir. 2012),

*abrogated on other grounds by BP P.L.C. v. Mayor and City Council of Balt.*, 593 U.S. 230 (2021); *Anesthesiology Assocs. of Tallahassee, Fla, P.A. v. Blue Cross Blue Shield of Fla., Inc.*, 2005 WL 6717869, at *2 (11th Cir. Mar. 18, 2005). By performing PBM services to obtain rebates for FEHBA carriers, Caremark likewise helps administer federal benefits on behalf of federal employers under OPM's direction. Indeed, OPM explicitly "contemplated" that FEHBA carriers would utilize PBMs and further "made [PBMs] directly accountable to the federal government." *Cnty. Bd. of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 253 (4th Cir. 2021) (holding that PBM subcontractor "acted under" direction of federal officer); *see Puerto Rico*, 119 F.4th at 182 (OPM "assume[s] that PBMs will contract with FEHBA carriers and receive rebates"); *Hawai'i*, 2024 WL 1907396, at *6 ("OPM contemplates that FEHBA carriers will utilize PBMs."); *see also, e.g.*, *Cal. Spine & Neurosurgery Inst. v. Nat'l Ass'n of Letter Carriers Health Benefit Plan*, 548 F. Supp. 3d 934, 941–42 (N.D. Cal. 2021).

35.     Accordingly, Caremark satisfies this requirement.

**B.     Caremark's Alleged Conduct Was Done "for or relating to" the Asserted Official Authority.**

36.     In 2011, Congress amended section 1442(a)(1) to provide that a suit need only be "for or *relating to* any act under color of [federal] office." 28 U.S.C. § 1442(a)(1) (2011) (emphasis added). A party seeking removal does not need to establish causation—just a less stringent "'related to' nexus." *Moore*, 25 F.4th at 35–36.

37.     The Commonwealth categorically challenges Caremark's rebate contracts, as well as its rebate negotiations and receipt of Manufacturer Payments. But Caremark's negotiations and contracts with Manufacturers for rebates were not unique to FEHBA, and for most of the time at issue, the manufacturer contracts that dictated rebates for FEHBA and non-FEHBA plans were the same contracts. *See Puerto Rico*, 119 F.4th at 190. Accordingly, a key component of the conduct

that the Commonwealth challenges is indivisible as between Caremark's FEHBA clients and its other clients.

38. Additionally, because the Commonwealth complains about industrywide negotiation and rebating practices, and alleges price increases impacting industrywide prescription drug sales, the charged conduct relates to acts made under a federal directive. And because the insulin sales in Massachusetts necessarily include sales under FEHBA contracts, the charged conduct relates to acts made under a federal directive. As explained above, Caremark's practices with regard to formularies and Manufacturer Payments in connection with FEHBA plans are subject to a range of contractual requirements imposed by OPM, including the requirement that Manufacturer Payments allocable to the carrier be credited against amounts paid by the federal government in connection with FEHBA benefits.

39. The Commonwealth challenges the legality of contracts whose terms, as noted, are governed by federal law. Compl. ¶¶ 24, 26, 32, 86, 308, 327, 329. But as explained, Caremark does not negotiate Rebate Agreements on a client-by-client basis, and many agreements about which the Commonwealth complains were negotiated to obtain rebates for, and govern the rebates available to, both FEHBA and non-FEHBA clients alike. *See supra* ¶¶ 4, 14. The Commonwealth's challenge to these contracts, then, is a direct challenge to Caremark's federal conduct. The Commonwealth could not possibly sever Caremark's conduct negotiating rebates for FEHBA carriers from other conduct that the Commonwealth alleges harms it.

40. The Commonwealth also alleges that PBMs' negotiation tactics have led to Manufacturers' increasing list prices. *See, e.g.*, Compl. ¶ 329. But the "list price" published by a wholesaler does not vary by wholesaler, pharmacy, PBM, or by PBM client. While wholesalers, pharmacies, and PBMs may negotiate different discounts or rebates that are calculated based on

the published list price, the list price itself is singular as to each drug at any given time. The conduct that the Commonwealth alleges improperly increased the "list price," therefore, was conduct undertaken on behalf of both FEHBA and non-FEHBA clients.

41.     Accordingly, the Commonwealth has not explained and cannot explain the degree to which Caremark's non-federal conduct or federal conduct can be deemed responsible for these allegedly increased payments.

42.     As the First Circuit held in *Puerto Rico*, the charged conduct "is related to acts Caremark performed under OPM's authority" because "[w]hen Caremark negotiates rebates on behalf of FEHBA carriers, it assists OPM in carrying out its official task of administering federal health benefits." 119 F.4th at 190. Thus, "the Commonwealth's lawsuit—by targeting those negotiations—therefore implicates Caremark's work 'carried out for' OPM's 'authority.'" *Id.* at 191; *see also Hawai'i*, 2024 WL 1907396, at *10 ("Caremark has established the causal-nexus requirement in the causal nexus analysis."); *California v. CaremarkPCS Health LLC*, 2024 WL 3770326, at *2 (9th Cir. Aug. 13, 2024) (Ikuta, J., concurring) ("[I]n targeting Caremark's rebate negotiations for private clients, California necessarily also targets Caremark's rebate negotiations for the federal government (since they are the same negotiations).").

### C.     Caremark Has Colorable Federal Defenses.

43.     For federal-officer removal purposes, a defense only needs to be colorable. *Leite v. Crane Co.*, 749 F.3d 1117, 1124 (9th Cir. 2014). In assessing whether a defense is colorable, the court must not be "grudging." *Jefferson County*, 527 U.S. at 431. Here, Caremark has colorable preemption defenses under the express FEHBA preemption provision and under the doctrine of obstacle preemption.

44.     FEHBA provides that "[t]he terms of any contract under this chapter which relate to the nature, provision, or extent of coverage or benefits (including payments with respect to

benefits) shall supersede and preempt any State or local law, or any regulation issued thereunder, which relates to health insurance or plans." 5 U.S.C. § 8902(m)(1). As explained above, contracts with OPM contain terms that govern the PBMs' obligations as they relate to formularies and rebates.

45. Here, the Commonwealth challenges precisely what the contractual terms imposed by OPM authorize: PBMs' negotiating for and collecting rebates. Compl. ¶¶ 318 fig. 8, 327–29.

46. Moreover, as explained, the contractual terms imposed by OPM require PBMs to disclose Manufacturer Payments as reductions to the costs associated with prescription drugs, including insulin. The Commonwealth's claims in this case fundamentally challenge whether PBMs may make any representation that Manufacturer Payments reduce payors' costs. *See, e.g.*, *id.* ¶ 522 (alleging that, among other things, PBMs' statements that rebates lower costs are "unfair and deceptive").

47. As set forth above, the contractual terms imposed by OPM authorize Manufacturer Payments in connection with formulary placement and/or access. The Commonwealth's claims in this case fundamentally challenge the propriety of formularies developed by PBMs, and whether PBMs may consider Manufacturer Payments in connection therewith. *Id.* ¶¶ 24–25 (alleging that rebates are *quid pro quo* payments in exchange for formulary inclusion on the PBMs' standard offerings); *id.* ¶ 289 ("The timing of the list price increases reveal that each Manufacturer Defendant has not only dramatically increased prices for the at-issue diabetes treatments, they have also done so in perfect lockstep."). Caremark therefore "possesses a colorable federal defense for its negotiations on behalf of FEHBA carriers." *Puerto Rico*, 119 F.4th at 190; *see Hawai'i*, 2024 WL 1907396, at *12–13.

48.     The Commonwealth's claims separately are barred under the doctrine of obstacle preemption.  Preemption under that doctrine applies where "state laws stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 32 F.4th 67, 79 (1st Cir. 2022) (alteration in original). The Commonwealth's lawsuit stands as an obstacle to the accomplishment of Congress's objectives in enacting FEHBA to provide competitive healthcare benefits to federal employees. The Commonwealth seeks to enjoin PBMs from negotiating contracts containing authorized rebates or agreeing to formulary placement.  Compl. at pp.144–45.  The Commonwealth's requested injunctive relief therefore would interfere with Congress's purpose and prevent Caremark from carrying out its obligations to comply with its responsibilities to OPM pursuant to FEHBA contracts.

## SUPPLEMENTAL JURISDICTION

49.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the claims asserted by the Commonwealth regarding all non-FEHBA beneficiaries against Defendants.  The Commonwealth's claims regarding all non-FEHBA beneficiaries against Defendants are "other claims that are so related to" its claims regarding FEHBA that "they form part of the same case or controversy."  28 U.S.C. § 1367(a).  Fundamentally, the Commonwealth alleges that Manufacturers "inflate[] list prices" in exchange for "Manufacturer Payments [that] … are *quid pro quo* for formulary inclusion on the PBMs' standard offerings."  Compl. ¶ 24. Accordingly, the Court should exercise supplemental jurisdiction over the entire Action.

## ALL OTHER REMOVAL REQUIREMENTS ARE SATISFIED

### A.     The Notice of Removal Is Timely.

50.     This Notice of Removal is timely.  *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 347–48 (1999).

### B. Consent Is Not Required.

51. The federal-officer-removal statute does not require other Defendants to consent to removal. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 134 (2d Cir. 2007) (explaining that removal under the federal officer statute does not "require[] the consent of all defendants"). Indeed, "[i]t is the settled rule that removal under 28 U.S.C. § 1442 can be effected by any defendant in an action, with or without the consent of co-defendants." *Fernandez v. Tyson Foods, Inc.*, 509 F. Supp. 3d 1064, 1068 n.1 (N.D. Iowa 2020) (citation omitted).

### C. Written Notice of Removal

52. Caremark files with this Notice of Removal a copy of the state court docket and the Complaint. *See* Exhibits A, C.

53. Contemporaneously herewith, Caremark is filing with the state court Clerk this Notice of Removal. Caremark also is providing written notice of this Notice of Removal to the Commonwealth, through its attorneys of record.

### D. Non-Waiver of Defenses.

54. By filing this Notice of Removal, Caremark reserves and does not waive any procedural or substantive defense available to it, including, without limitation, lack of subject-matter jurisdiction of the state court, lack of personal jurisdiction, improper venue, insufficient process, insufficient service of process, and failure to state a claim upon which relief can be granted. *See* 5C FED. PRAC. & PROC. CIV. § 1395 (3d ed.) ("A party who removes an action from a state to a federal court does not thereby waive any of his or her Federal Rule 12(b) defenses or objections. . . . [I]nasmuch as the jurisdiction of a removed action essentially is derivative, any defect in jurisdiction or process present in the state suit may be asserted in the district court following removal." (footnotes omitted)); *Freeman v. Bee Mach. Co.*, 319 U.S. 448,

449 (1943) ("[W]here a state court lacks jurisdiction of the subject matter or of the parties, the federal District Court acquires none on a removal of the case. That is true even where the federal court would have jurisdiction if the suit were brought there." (citations omitted)); *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 72 (2d Cir. 1998) ("A party who removes an action from state to federal court does not, in so doing, waive the defense of improper venue as to the underlying state court action."); *Garden Homes, Inc. v. Mason*, 238 F.2d 651, 653 (1st Cir. 1956) ("Effective service is, of course, the keystone to a court's personal jurisdiction over the defendant, and it is clear that this defense is not waived upon removal of an action from the state court to a federal court." (citations omitted)); *Moss v. Atl. Coast Line R.R. Co.*, 157 F.2d 1005, 1006 (2d Cir. 1946) ("[A] defendant is not precluded from having the suit dismissed because its motion to remove was in any sense the waiver of a right, for it has waived nothing by taking that action. ").

WHEREFORE, CaremarkPCS Health, L.L.C. removes this Action to this Court for further proceedings according to law.

DATED: February 12, 2025

By: /s/ Marc C. Laredo
Mark D. Smith (BBO #542676)
Marc C. Laredo (BBO #543973)
Laredo, Smith & Kane, LLP
101 Federal Street, Suite 650
Boston, MA 02110
617-443-1100
smith@laredosmith.com
laredo@laredosmith.com

OF COUNSEL:

Enu Mainigi (*pro hac* vice forthcoming)
Craig D. Singer (*pro hac vice* forthcoming)
R. Kennon Poteat III (*pro hac vice* forthcoming)
A. Joshua Podoll (*pro hac vice* forthcoming)
Daniel Dockery (*pro hac vice* forthcoming)

WILLIAMS AND CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel: (202) 434-5000
Fax: (202) 434-5029
emainigi@wc.com
csinger@wc.com
kpoteat@wc.com
apodoll@wc.com
ddockery@wc.com

Counsel for CaremarkPCS Health, L.L.C.

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on this 12th day of February, 2025, a true and accurate copy of the foregoing instrument was filed electronically with the United States District Court for the District of Massachusetts using the Court's CM/ECF Electronic Filing System and a copy of the same to be served on all counsel of record.

*/s/ Marc C. Laredo*
Marc C. Laredo
